UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNATHAN GAFFORD,

      Plaintiff,

                              Case No. 1:23-cv-545

v.

                              HON. JANE M. BECKERING

CITY OF GRAND RAPIDS, et al.,

      Defendants.
_____/

**<u>OPINION AND ORDER</u>**

Law enforcement stopped Plaintiff Johnathon Gafford (Gafford) in May 2022 as part of its investigation into a string of breaking and enterings.  Gafford filed this suit, alleging civil rights claims under 42 U.S.C. § 1983 (Counts I & II) and several state-law claims (Counts III–VII).  Now pending before the Court are Defendants' motions to dismiss (ECF Nos. 30 & 33).  For the following reasons, the Court grants the motions as to Counts I and II and declines to exercise supplemental jurisdiction over Counts III through VII.

## I.  BACKGROUND

### A.  Factual Background

On May 28, 2022, at approximately 1:21 a.m., police officers from the Grand Rapids Police Department (GRPD) responded to a report of a possible breaking and entering at "Joyology," a cannabis dispensary (Am. Compl. [ECF No. 29] ¶ 93; GRPD Incident Report [Grand Rapids Defs. Ex. A], ECF No. 31-1 at PageID.355).  Kentwood Police Department (KPD) Sergeant Timothy Dykgraaf was dispatched to assist GRPD at Joyology (Am. Compl. ¶ 93; KPD Incident Report [Kentwood Defs. Ex. A], ECF No. 34-1 at PageID.490).  Three KPD patrol officers also responded

to the scene at Joyology:  Kameron Rasmussen, Seth Beelen, and Jonathan Tabor (Am. Compl. ¶ 93; KPD Incident Report, ECF No. 34-1 at PageID.488).

The officers were informed that reports about previous break-ins at marijuana shops described the suspect vehicle as a "newer Black SUV with black rims" (Am. Compl. ¶¶ 93 & 138; GRPD Incident Report, ECF No. 31-1 at PageID.355; KPD Incident Report, ECF No. 34-1 at PageID.489; Beelen Body Worn Camera (BWC) [Kentwood Defs. Ex. D, ECF No. 34-4] at 1:27[1]). The officers examined the building and parking lot, with one officer noting that the "suspect vehicle is not here by the looks of it" (Beelen BWC at 1:28).

Meanwhile, Gafford, a resident of Beaumont, Texas, was visiting Grand Rapids, Michigan on business (Am. Compl. ¶¶ 1, 8, 27–28).  For his trip, Gafford had rented a "black sport utility vehicle—specifically an Alpha Romero [sic]" (*id.* ¶ 29), model year 2022 (GRPD Incident Report, ECF No. 31-1 at PageID.355).

At 1:32 a.m., while the officers were still on scene responding to the call from Joyology, they received information from dispatch that a vehicle matching the description of the SUV potentially tied to the string of breaking and entering crimes—the vehicle Gafford was driving— was in the vicinity (Am. Compl. ¶¶ 29, 86–88; GRPD Incident Report; Dykgraaf BWC [Kentwood Defs. Ex. G, ECF No. 34-7] at 14:10; Beelen BWC at 1:32 ("there's a black SUV … that matches the description of the suspect vehicle that fled")).

Gafford had just left a bar in Kentwood, Michigan and noticed a police vehicle "very close[ly]" "tailing him as he drove to his hotel … for more than five (5) minutes" (Am. Compl. ¶¶ 32–33, 35–36).  Gafford, who is African-American, alleges that the police officers had "noticed

---

[1] Unless otherwise noted, the Court refers to the time stamps in the top right corner of the videos submitted by Defendants, a stamp that correlates to Eastern Standard Time, not the time elapsed in each particular video.

the color of [his] skin," and Gafford was "concerned … that he was being targeted for his race" (*id.* ¶¶ 1, 34, 39). The police car's sirens were not activated, and Gafford stopped at a convenience store for a beverage before driving to the hotel where he was staying (*id.* ¶¶ 37, 40–41).

As Gafford pulled into the hotel parking lot, a "number" of police vehicles were following him, with their overhead lights and/or sirens now activated (*id.* ¶¶ 43–44). Gafford parked his car and stayed inside it (*id.* ¶ 45; In-Car Video (ICV)–Vehicle 2 [Grand Rapids Defs. Ex. F, ECF No. 31-6] at 1:33). Sergeant Dykgraaf left the scene at Joyology and joined the other officers already at the hotel (Dykgraaf Dashcam Video [Kentwood Defs. Ex. B, ECF No. 34-2] at 5:33[2]; Dykgraaf BWC at 1:33). KPD Officers Rasmussen, Beelen, and Tabor remained at Joyology, searching for any suspects within the store with the assistance of a K-9 unit. *See generally* Beelen BWC; Tabor BWC [Kentwood Defs. Ex. E, ECF No. 34-5]; Rasmussen BWC [Kentwood Defs. Ex. F, ECF No. 34-6].

According to Gafford, the officers at the hotel "surrounded" his car, and one officer "fixed" a spotlight on Gafford's car (Am. Compl. ¶ 46). Gafford alleges that "the majority of the [officers] had exited their vehicles, and several had their firearms and/or flashlights pointed at him" (*id.* ¶ 49). One officer allegedly ordered Gafford to "make himself known," and Gafford "slowly opened the door to his SUV and came out with his hands up, in compliance with the orders given [to] him" (*id.* ¶¶ 55, 57). According to Gafford, multiple officers, including GRPD Officers Kyle Wilson and Ryan Johnston, next ordered Gafford to "walk backwards toward one of the vehicles with his hands raised" (*id.* ¶¶ 11–12, 68). Gafford alleges that he also complied with this order (*id.* ¶ 69).

---

[2] Sergeant Dykgraaf's time stamp from his dashcam video is 4 hours ahead of Eastern Standard Time.

According to Gafford's information and belief, Officer Wilson next ordered Gafford to "drop to his knees," and Gafford again complied (*id.* ¶¶ 70–72).  Consistent with the video footage, Gafford does not allege that any officer struck him, pushed him, shoved him, or caused him any physical injury.  According to Gafford's information and belief, Officer Wilson also handcuffed Gafford and placed him in the back of a police car (*id.* ¶¶ 74–75, 80–81).  Another officer repeatedly yelled, "Anyone else in the vehicle?  Make yourself known" (*id.* at 1:35).  After Gafford, the only vehicle occupant, was handcuffed, Sergeant Dykgraaf holstered his weapon (Dykgraaf BWC at 1:38).

The officers explained to Gafford that he "matched the description of a suspect for breaking and entering in the area" (Am. Compl. ¶ 93).  Gafford alleges that law enforcement's belief was based only on "the color of [his] vehicle, the fact that it was an SUV, and [Gafford's] race" (*id.* ¶ 88).  At the time, Gafford agreed with the officers that "you're doing your job" and "had every right to pull me over," telling them that "you did good, you did good" (ICV, Grand Rapids Defs. Ex. D [ECF No. 31-4] at 5:39[3] & 5:43).

Gafford consented to the officers searching the rental vehicle, and the police located "nothing of note," ultimately concluding that Gafford was not involved in the incident they were investigating (Am. Compl. ¶ 98; GRPD Incident Report, ECF No. 31-1 at PageID.355; ICV, Grand Rapids Defs. Ex. D, at 5:40).  Gafford exited the police car, and the handcuffs were removed (BCV, Kentwood Defs. Ex. C [ECF No. 34-3] at 1:44).  Approximately fifteen minutes after his arrival, Gafford was released from the scene, extending his hand to shake hands with a couple of the officers as he left (Am. Compl. ¶ 101; BWC Video #2, Grand Rapids Defs. Ex. C [ECF No. 31-3] at 1:46; ICV–Vehicle 2 at 5:46).

---

[3] The ICV time stamp is 4 hours ahead of Eastern Standard Time.

**B.  Procedural Posture**

Approximately one year later, on May 26, 2023, Gafford initiated this case, naming ten Defendants and alleging seven claims, although his fourth claim was misnumbered as a second "Count III" (ECF No. 1).  Specifically, Gafford named Defendants City of Grand Rapids and GRPD Officers Johnston, Wilson, and John Doe (collectively "the Grand Rapids Defendants"); and Defendants City of Kentwood and KPD Officers Beelen, Dykgraaf, Rasmussen, Tabor, and John Doe (collectively "the Kentwood Defendants").  The Grand Rapids Defendants filed a motion to dismiss (ECF No. 23), and this Court, without addressing the merits of the motion, granted Gafford leave to amend his Complaint (Order, ECF No. 27).

On August 29, 2023, Gafford filed an Amended Complaint, naming the same ten Defendants but adding and modifying[4] some of his factual allegations and correcting his typographical error (ECF No. 29).  Gafford alleges two claims under this Court's federal-question jurisdiction, 28 U.S.C. § 1331, and five claims under this Court's supplemental jurisdiction, 28 U.S.C. § 1367(a) (ECF No. 29).  He identifies the claims as follows:

    I.  Civil Rights Violations under 42 U.S.C. § 1983—Fourth Amendment, Fourteenth Amendment

    II.  Civil Rights Violations under 42 U.S.C. § 1983—Defendants Grand Rapids and Kentwood

    III. Assault and Battery

    IV. False Arrest

    V.  False Imprisonment

---

[4] For example, as the Grand Rapids Defendants point out (ECF No. 31 at PageID.339 n.4), Gafford originally and repeatedly alleged that Defendants detained him for "more than one hour" or "nearly one hour."  *See* Compl. [ECF No. 1] ¶¶ 5, 60, 68, 115, & 123.  In his Amended Complaint, Gafford alleges merely that he was detained for an "unreasonable" amount of time (Am. Compl. ¶¶ 1, 84, 101, 172).

VI. Intentional Infliction of Emotional Distress

VII. Gross Negligence

(ECF No. 29).

In lieu of answering the Amended Complaint, the Grand Rapids Defendants filed another Motion to Dismiss (ECF No. 30). The Grand Rapids Defendants attached to their motion the GRPD Incident Report from May 28, 2022 (ECF No. 31-1) and six forms of video evidence (ECF No. 31-2 through 31-7). Gafford filed a Response in opposition (ECF No. 42), to which the Grand Rapids Defendants filed a Reply (ECF No. 44). The Kentwood Defendants also filed a Motion to Dismiss (ECF No. 33), which they likewise supported with the relevant KPD Incident Report (ECF No. 34-1) and six different forms of video evidence (ECF Nos. 34-2 through 34-7). Gafford filed a Response in opposition (ECF No. 43), and the Kentwood Defendants filed a Reply (ECF No. 45). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

## II. ANALYSIS

### A. Motion Standard

Defendants' motions are filed pursuant to Federal Rule of Civil Procedure 12(b)(6), which authorizes the court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

When considering a motion to dismiss for failure to state a claim, a court does not generally consider matters outside the pleadings. *See Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016); *see also* FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). Where there are "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss," the court may consider them "so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt, supra.* Notably, police reports are public records that may be considered when deciding whether a claim is plausible. *See, e.g., Courser v. Allard*, 969 F.3d 604, 620 (6th Cir. 2020) (affirming the district court's 12(b)(6) analysis, which included reliance on a police report to which the plaintiff had referred in his complaint).

Additionally, where the record contains "a videotape capturing the events in question," courts must "adopt a version of the facts that a reasonable jury could accept consistent with the video evidence." *Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023). Factual disputes left by "gaps or uncertainties" in the videos are construed in the light most favorable to the plaintiff, ensuring that any reasonable inferences continue to "break his way." *Id.* (quoting *LaPlante v. City of Battle Creek*, 30 F.4th 572, 578 (6th Cir. 2022)). However, "to the degree the videos are clear and 'blatantly contradict' or 'utterly discredit' the plaintiff's version of events," courts should "rely on the videos over the complaint[.]" *Id.* (quoting *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (brackets omitted) (explaining that considering video evidence at the motion-to-dismiss stage "honors" the principles of the doctrine of qualified immunity). In other words, where video evidence makes a plaintiff's allegations "implausible," "the court should not rely on the allegations in the complaint, but should instead 'view[ ] the facts in the light depicted by the videotape.'" *Osberry v. Slusher*, 750 F. App'x 385, 390 (6th Cir. 2018). *See, e.g., Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) (deciding that where "no reasonable jury could watch the video and agree with Bailey that the gunman was wearing a white coat instead of a black and white skeleton sweatshirt[,] the video 'utterly discredit[s]' Bailey's version of events and allows us to ignore the 'visible fiction' in his complaint").

### B. Gafford's Federal Claims

The Court turns first to Gafford's federal claims under 42 U.S.C. § 1983, which form the basis of this Court's original jurisdiction over the subject matter of this case. Section 1983 makes "liable" "[e]very person" who "under color of" state law "subjects, or causes to be subjected," another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. Section 1983 does not confer substantive rights but merely

provides a statutory vehicle for vindicating rights found in the United States Constitution. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Dibrell v. City of Knoxville, Tenn.*, 984 F.3d 1156, 1160 (6th Cir. 2021). To bring a claim under § 1983, a plaintiff must "identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) (citation omitted). A court's threshold inquiry under § 1983 is always to identify the specific constitutional right at issue. *Dibrell, supra.* Once the right is identified, the court must then consider the statutory "elements of, and rules associated with, an action seeking damages for its violation" under § 1983. *Id.* Here, Gafford relies on the Fourth and Fourteenth Amendments for his claims against the individual Defendants in Count I and his claims against the City of Grand Rapids and City of Kentwood in Count II.

### 1. Section 1983 Claims Against Individual Defendants (Count I)

In Count I, Gafford alleges that unspecified "Defendants" violated his Fourth and Fourteenth Amendment rights. Specifically, he alleges that his "arrest was in violation of his rights under the Fourth Amendment under the U.S. Constitution, to be free from unreasonable arrest and in violation of his rights under the Fourteenth Amendment of the U.S. Constitution to due process of law and equal protection under the law" (Am. Compl. ¶ 148). *See also id.* ¶ 124 ("Plaintiff, under the United States constitution, is guaranteed protection against their persons being subjected to excessive force and from unreasonable searches and seizures, as well as due process and equal protection under the law."); and ¶ 125 ("Plaintiff was followed, pulled over, arrested with the use of deadly force from multiple police officers, and detained without probable or reasonable cause by Defendants.").

Consistent with the parties' briefing in this case, the Court has construed Gafford's allegations as presenting claims under § 1983 for (a) unreasonable seizure, (b) excessive force, and (c) equal protection.[5]  The individual Defendants raise the defense of qualified immunity to the § 1983 claims against them.  "[T]he ability to go forward on a § 1983 claim against an officer for a violation of the Fourth Amendment is 'limited by the qualified immunity exception.'" *Shumate v. City of Adrian, Mich.*, 44 F.4th 427, 439 (6th Cir. 2022) (citation omitted).  In *Crawford v. Tilley*, 15 F.4th 752 (6th Cir. 2021), the Sixth Circuit held that while "a plaintiff is generally not required to negate an affirmative defense [like qualified immunity] in a complaint[,] ... the validity of such defenses may be apparent from the face of the complaint, rendering a [Rule 12] motion appropriate." *Id.* at 763.

Gafford repeatedly argues in his responses to Defendants' motions that it is "patently unfair" to "force" him to litigate against factual assertions without the benefit of discovery (ECF No. 42 at PageID.519, 525–528, 538, & 550; ECF No. 43 at PageID.616, 623–625, 630, 648, & 650).  However, the United States Supreme Court has held that "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell v. Forsyth*, 472 U.S. 511,

---

[5] Finding it "unclear whether Plaintiff's claims of False Arrest and False Imprisonment sound in state or federal law," the Grand Rapids Defendants included a discussion of a fourth § 1983 claim: false arrest/imprisonment (ECF No. 31 at PageID.340). In contrast, the Kentwood Defendants' discussion of false arrest/imprisonment is confined to applying state law to the allegations in Gafford's Counts IV and V.  Gafford, who submitted essentially the same response to both motions, did not clarify his intention in how he pleaded his false arrest/imprisonment claim.  To the extent Gafford intended to plead a federal false arrest/imprisonment claim under § 1983 in addition to his False Arrest and False Imprisonment claims in Counts IV and V under state law, the federal claim would fail, for the reasons stated more fully herein, because Gafford's factual allegations do not plausibly demonstrate a violation of his Fourth Amendment rights where he was detained only so long as was necessary for the officers to determine that he had not committed the offense of breaking and entering.

526 (1985).  Hence, the Sixth Circuit has instructed that district courts have a "duty" to address qualified immunity when it is "properly raised prior to discovery."  *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 758 (6th Cir. 2022) (citation omitted).  Qualified immunity shields government defendants from not only liability but also litigation and discovery because "[i]nquiries of this kind can be peculiarly disruptive of effective government."  *Id.* (quoting *Harlow*, 457 U.S. at 817).

"A defendant is not entitled to qualified immunity at the pleadings stage if (1) 'the facts alleged make out a violation of a constitutional right' and (2) that right 'was clearly established when the event occurred so that a reasonable offic[ial] would have known that his conduct violated it.'"  *Myers*, 41 F.4th at 757 (quoting *Crawford*, 15 F.4th at 762–63).  Courts may address these two prongs in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "[I]f the complaint fails to allege facts plausibly showing the violation of a constitutional right (regardless of whether that right was clearly established), granting qualified immunity is appropriate on the pleadings."  *Myers*, 41 F.4th at 759.

Last, "it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct."  *Hopper v. Phil Plummer*, 887 F.3d 744, 756 (6th Cir. 2018) (citation omitted).  "[T]o establish liability and to overcome a qualified immunity defense, an individual must show that his or her own rights were violated, and that the violation was committed personally by the defendant."  *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014) (emphases omitted).  "When more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately. [And] the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way."  *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017).

### a. *Unreasonable Seizure*

In relevant part, Gafford alleges in Count I that at the hands of unspecified Defendants he was "followed, pulled over, arrested with the use of deadly force from multiple police officers, and detained without probable or reasonable cause" (Am. Compl. ¶ 125).  According to Gafford, Defendants "lacked an objective, good faith or reasonable belief" to investigate him (*id.* ¶ 126). Gafford alleges that unspecified Defendants violated his rights "by engaging in an unlawful and unreasonable search and seizure, by the actions listed above and circumstances occurring on that date" (*id.* ¶ 143).

The individual Defendants argue that Gafford's conclusory allegations fail to state a plausible unreasonable seizure claim against them.  The GRPD Officers argue that under the following facts Gafford alleges, they had the required reasonable suspicion to conduct an investigatory stop of Gafford:  (a) a contemporaneous report of a breaking and entering of a local business; (b) earlier reports included a description of a suspect vehicle as "a newer Black SUV with black rims"; and (c) while officers were responding to the call on May 28, 2022, Gafford drove by in a 2022 Black Alfa-Romeo with black rims (Grand Rapids Defs., ECF No. 31 at PageID.339).

Similarly, the KPD Officers argue that in pulling Gafford over, Sergeant Dykgraaf acted reasonably and constitutionally inasmuch as Dykgraaf also reasonably relied on the information provided by dispatch that gave rise to a reasonable suspicion regarding Gafford's potential involvement in criminal activity (Kentwood Defs., ECF No. 34 at PageID.468–469).  The KPD Officers point out that the body camera videos of Defendants Rasmussen, Tabor, and Beelen clearly show that these three named Defendants were not even on the scene of Gafford's stop at the hotel (ECF No. 45 at PageID.789).

In response, Gafford argues that based on the circumstances as alleged, a reasonable jury could "easily determine" that the individual Defendants' "extreme actions" were "beyond the scope and completely unreasonable" (ECF No. 42 at PageID.536–539; ECF No. 43 at PageID.636–638).

Gafford's unreasonable-seizure claim in Count I is properly dismissed.

The Fourth Amendment guarantees the right "to be secure ... against unreasonable searches and seizures."  U.S. CONST. amend. IV.  A seizure occurs when "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (citation omitted).  The Supreme Court has distinguished two forms of seizure, each of which garners a different level of scrutiny.  First, an officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, he has "reasonable suspicion," that is, "a particularized and objective basis for suspecting the particular person ... of criminal activity based on specific and articulable facts." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1 (1968) (establishing the permissibility of an investigatory or "*Terry* stop" based on reasonable suspicion)).  For such a stop to be reasonable, "the degree of intrusion into the suspect's personal security [must be] reasonably related in scope to the situation at hand." *Id.* (quoting *Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006)).

"If 'the length and manner' of the stop, including any force used, are not 'reasonably related to the basis for the initial intrusion,'" then the stop ripens into the second form of seizure—an arrest, for which the officers must show probable cause. *Brown, supra* (citation omitted).  The fact that a plaintiff is not formally arrested does not resolve the issue of whether his detention amounted to a "de facto arrest" requiring probable cause. *Gardenhire v. Schubert*, 205 F.3d 303, 314 (6th Cir. 2000).  Conversely, "'the use of guns, handcuffs, and detention in a police cruiser do not

13

automatically transform a *Terry* stop into an arrest[.]"  *Brown*, 779 F.3d at 415 (quoting *Smoak*, 460 F.3d at 781).  "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop."  *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001).  *See also Bennett v. City of Eastpointe*, 410 F.3d 810, 836–407 (6th Cir. 2005) (holding that the use of either handcuffs or detention during a *Terry* stop may be permissible "so long as the circumstances warrant the restraint").

Here, as a threshold matter, Gafford does not allege in his Amended Complaint (nor identify in briefing) how Defendants Rasmussen, Tabor, and Beelen participated in the stop on May 28, 2022.  Gafford merely indicates that "each office[r] here had the exclusive ability to violate Mr. Gafford's rights," and he opines that the Kentwood Defendants' claim that Officers Rasmussen, Tabor, and Beelen were not part of the stop at the hotel is "a claim that goes outside the scope of the complaint" that should be given "no weight" (ECF No. 43 at PageID.624–625, 630).  While reasonable inferences from video evidence must break Gafford's way, *see Akima*, 85 F.4th at 422, there is no reasonable inference available to Gafford with regard to his claims against Defendants Rasmussen, Tabor, and Beelen.  Their body camera videos clearly place them at Joyology, never the hotel, making Gafford's unreasonable-seizure allegations against them implausible.

Gafford's claims against the remaining individual Defendants—GRPD Officers Johnston, Wilson, and Doe[6]; and KPD Officers Dykgraaf and Doe—fare no better.  First, under the totality

---

[6] Use of a "John Doe" designation is simply a placeholder.  An action is not commenced against such party until he is both identified and served with process.  *Bufalino v. Michigan Bell Tel. Co.*, 404 F.2d 1023, 1028 (6th Cir. 1968).  If a plaintiff does not substitute a named party for a John Doe defendant after being given a reasonable opportunity to identify and serve the individual, then the claims asserted against the unnamed defendant are subject to dismissal.  *Khaled v. Dearborn Heights Police Dep't*, No. 14-14743, 2016 WL 7188027, at *5 (E.D. Mich. 2 Dec. 12, 2016), aff'd, 711 F. App'x 766 (6th Cir. 2017).  *See* FED. R. CIV. P. 4(m); W.D. Mich. LCivR 41.1.

of the circumstances alleged, Defendants had reasonable suspicion of criminal activity.  Gafford

alleges that Defendants "lacked an objective, good faith or reasonable belief" to investigate him

(Am. Compl. ¶ 126), but "the tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.  "Threadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Reasonable suspicion "is not particularly difficult to establish." *United States v. Smith*, 74

F.4th 799, 801 (6th Cir. 2023) (citing *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir.

2022)).  Importantly, "[r]easonable suspicion need not arise from an officer's own observations;

rather, it may arise from informant tips and dispatcher information." *Williams v. Leatherwood*,

258 F. App'x 817, 821 (6th Cir. 2007) (citing *Smoak*, 460 F.3d at 779).  Under the totality of the

alleged circumstances, the individual Defendants had a sufficient factual basis from the dispatcher

for making the *Terry* stop, to wit:  clear information of the nearby presence of a vehicle matching

the description of the suspect vehicle within the time and vicinity of the most recent breaking and

entering.

Additionally, the nature of the seizure did not exceed the bounds of a permissible

investigative stop.  The entire length of the detention was approximately fifteen minutes.  While

at least Sergeant Dykgraaf initially had his weapon pointed at Gafford, Gafford does not allege

any further display or use of force by Dykgraaf or other officers.  With Gafford detained in a police

cruiser, the officers confirmed his identity and that he was traveling alone, and they conducted a

consensual search of the rental vehicle.  As soon as the officers ruled Gafford out as a suspect in

the breaking-and-entering incident they were investigating, they released him.  Based upon the

few facts known to the officers at the time of the stop, their brief use of firearms and handcuffs

and Gafford's short detention in the cruiser were reasonably necessary to protect the officers'

safety while they worked to dispel their reasonable suspicion that he was involved in criminal activity.  The precautions were therefore reasonably related to the investigation that warranted the initial stop.  In other words, the police actions did not venture "beyond checking out the suspicious circumstances that led to the original stop."  *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994).

In sum, assuming the truth of Gafford's factual allegations, the allegations do not plausibly support the conclusion that either the initial stop or the nature of the seizure violated the Fourth Amendment.  Gafford's unreasonable-seizure claim in Count I is properly dismissed.

**b.  *Excessive Force***

In addition to the right to be free from unlawful seizures, the Fourth Amendment also protects individuals from the use of excessive force during an arrest or investigatory stop.  Again, Gafford alleges in Count I that he was "pulled over, arrested with the use of deadly force from multiple police officers, and detained without probable or reasonable cause by Defendants" (Am. Compl. ¶ 125).  More specifically, he alleges that unspecified "Defendants' use of force against Plaintiff—including arresting Plaintiff at gunpoint—far exceeded what is reasonably necessary for a non-violent, investigative stop" (*id.* ¶ 128).

The individual Defendants argue that Gafford's conclusory allegations fail to state a plausible excessive-force claim against them.  Specifically, Defendants point out that nowhere in Gafford's Amended Complaint does he allege that any officer used physical force against him, only that they "threatened" force by pointing their "guns" at him (Grand Rapids Defs., ECF No. 31 at PageID.336–338; Kentwood Defs., ECF No. 34 at PageID.469).  Additionally, the Kentwood Defendants point out that the uncontroverted video evidence shows that only one of the named

Kentwood Defendants—Sergeant Dykgraaf—was actually on scene and potentially interacted with Gafford (ECF No. 45 at PageID.789).

In response, Gafford argues that, like the excessive-force allegations in *Binay v. Bettendorf*, 601 F.3d 640, 647–50 (6th Cir. 2010), which the Sixth Circuit found plausible, his allegations also plausibly state a claim where "Defendants held him at gunpoint, ordered him out of his vehicle, handcuffed him, and detained him" (ECF No. 42 at PageID.530–531; ECF No. 43 at PageID.627–628).  Additionally, Gafford argues that while a reasonable police officer may believe he would be justified to brandish a firearm against a non-cooperative individual, that proposition does not help Defendants because Gafford was fully cooperative (ECF No. 42 at PageID.532–533; ECF No. 43 at PageID.629–630).

Gafford's excessive-force claim in Count I is properly dismissed.

To hold an officer liable for the use of excessive force, a plaintiff must demonstrate that the officer "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Binay*, 601 F.3d at 650 (citation omitted).  "As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* (citation omitted).  "Each defendant's liability must be assessed individually based on his own actions." *Id.*

Like his unreasonable-seizure claim against Defendants Rasmussen, Tabor, and Beelen, Gafford's excessive-force claim against these particular Defendants also fails.  There is no reasonable inference available to Gafford with regard to his excessive-force claims against Defendants Rasmussen, Tabor, and Beelen where their body camera videos clearly place them at Joyology, never the hotel.  His excessive-force allegations against them are implausible.

17

Even assuming the remaining individual Defendants (GRPD Officers Johnston, Wilson, and Doe; and KPD Officers Dykgraaf and Doe) were personally involved at the scene, they are entitled to qualified immunity if the alleged facts do not make out a constitutional violation. According to the Supreme Court, "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Graham v. Connor*, 490 U.S. 386, 397 (1989).

"When making an arrest or investigatory stop, the police have 'the right to use some degree of physical coercion or threat thereof to effect it.'" *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). *See also Humphrey v. Mabry*, 482 F.3d 840, 849 (6th Cir. 2007) ("[T]his court has specifically approved the use of guns and handcuffs during an investigatory stop."). Reasonableness is assessed at the moment of the use of force, as "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Wright, supra.* (quoting *Graham*, 490 U.S. at 396). Additionally, "where the constitutional violations are based on the collective knowledge of a number of police officers, it is important to recognize that an individual officer is still entitled to qualified immunity if an objectively reasonable officer in the same position could have reasonably believed that he or she was acting lawfully." *Humphrey*, 482 F.3d at 847.

Analyzing whether a particular use (or display) of force was excessive involves balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Muehler v. Mena*, 544 U.S. 93, 108 (2005) (quoting *Graham*, 490 U.S. at 396). Three factors from *Graham* guide the Court's excessive-force analysis: (1) "the severity of the crime at issue;" (2) "whether the suspect poses an immediate

threat to the safety of the officers or others;" and (3) whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *King v. City of Rockford, Michigan*, No. 22-2038, ___ F.4th ___, 2024 WL 1321259, at *6 (6th Cir. Mar. 28, 2024) (quoting *Graham*, *supra* at 396). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Dorsey v. Barber*, 517 F.3d 389, 401 (6th Cir. 2008).  The specific question is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham, supra.*

Again, the allegations in this case do not include any allegation by Gafford that any officer actually used force or caused him any physical injury.  His excessive-force claim is confined to his allegation that unspecified Defendants displayed force by approaching his vehicle with their guns drawn.  For many of the reasons previously stated, the Court concludes that it was reasonable for the officers to approach Gafford's vehicle with their guns drawn when conducting the *Terry* stop.  The early morning stop was an evolving and potentially volatile situation.  With officers still on the scene responding to the call of a breaking and entering in progress at Joyology, they received information from dispatch that a vehicle matching the description of the SUV potentially tied to the string of breaking and entering crimes was in the vicinity.  The officers had a reasonable suspicion to believe that someone in the vehicle was involved in serious and pervasive criminal activity.  *See* MICH. COMP. LAWS § 750.110 (providing that "[a] person who breaks and enters … is guilty of a felony punishable by imprisonment for not more than 10 years").  There was no information provided about how many occupants were in the vehicle, nor did dispatch reference whether any of the prior crimes had been committed with a firearm.  Given the scant facts with which they were operating, a reasonable officer would have been justified in drawing his weapon

for protection while approaching Gafford's vehicle.  With hindsight, it is clear that Gafford did not

pose any threat to the officers, but the reasonableness of the officers' conduct is viewed from the

perspective of a reasonable officer on the scene at that moment of initial contact.  The Court

concludes that application of the *Graham* factors, on balance, does not reveal a constitutional

violation; rather, the officers' actions, as alleged, were objectively reasonable in light of the facts

and circumstances confronting them on May 28, 2022.

Gafford's reliance on the Sixth Circuit's decision in *Binay* does not compel a different

conclusion.  While the plaintiffs in *Binay*, like Gafford, "cooperated throughout the ordeal," 601

F.3d at 650, other facts in *Binay* readily distinguish it from the case at bar.  For example, the

officers in *Binay* wore masks during the entry and search, which the plaintiffs argued "added to an

environment of intimidation and terror such that it contributed to a use of excessive force."  *Id.*

Additionally, the Sixth Circuit noted that questions remained about whether the defendants

"continued to detain the plaintiffs at gunpoint long after the risk of flight and risk to the officers

subsided."  *Id.*  Indeed, the Sixth Circuit aptly observed that "the fact that it is *sometimes* reasonable

to use handcuffs and guns when detaining suspects does not support Defendants' argument that

the amount of force used *in this case* was objectively reasonable."  *Id.* at 649 (emphases in

original).  Rather, whether an exercise of force is excessive varies, "depending on the facts and

circumstances of the specific case."  *Id.* at 649–50.

Gafford has not stated a plausible excessive-force claim against the individual Defendants

based on the alleged facts and circumstances in this case, and his excessive-force claim in Count I

is therefore properly dismissed. In failing to plausibly allege a constitutional violation, Gafford

concomitantly fails to overcome the individual Defendants' qualified immunity defense.  *See*

*Myers*, 41 F.4th at 758–59; *Robertson*, 753 F.3d at 615.

c.  *Equal Protection*

Next, the Court examines Gafford's allegation in Count I that unspecified "Defendants" were "aware of his race at the time they violated his rights" and that he faced unequal treatment "because of his race" in violation of his rights under the Fourteenth Amendment of the United States Constitution to equal protection under the law (Am. Compl. ¶¶ 145–148).

The individual Defendants argue that Gafford's conclusory allegations fail to state a plausible equal protection claim against them.  They point out that Gafford has not alleged that any similarly situated individual of another race was treated differently by either the GRPD or KPD Officers and has not identified any specific individual who was treated differently and was of a different race (Grand Rapids Defs., ECF No. 31 at PageID.342; Kentwood Defs., ECF No. 34 at PageID.473).

In response, Gafford "direct[s] this Court to circumstantial and statistical evidence of the Grand Rapids Police Department engaging in racial discrimination," to wit: the active investigations by the Michigan Department of Civil Rights (MDCR) into allegations of racial discrimination against the GRPD (ECF No. 42 at PageID.546–547; ECF No. 43 at PageID.646–647).  And Gafford adds that the KPD was "assisting the Grand Rapids Police Department in violating Mr. Gafford's rights based on what appears to be racial animus" (ECF No. 43 at PageID.647).

Gafford's equal protection claim in Count I is properly dismissed.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV and citing

*Plyler v. Doe,* 457 U.S. 202, 216 (1982)).  "[A] valid equal-protection claim requires showing that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'"  *Reform Am. v. City of Detroit, Michigan*, 37 F.4th 1138, 1152 (6th Cir. 2022) (citation omitted).  "To be 'similarly situated' for purposes of an equal-protection claim, the plaintiff and the comparator must be alike 'in all relevant respects.'"  *Id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Here, Gafford alleges only that he is African American (Am. Compl. ¶ 27); he was "targeted for his race" (*id.* ¶¶ 39, 115–17) and "faced the [alleged] treatment because of his race" (*id.* ¶¶ 141–46); and the MDCR "has been investigating race discrimination within the Grand Rapids Police Department for years" (*id.* ¶¶ 154–158).  Gafford's vague and conclusory allegations are not well-pleaded and are insufficient to plausibly suggest an entitlement to relief.  Specifically, he wholly fails to identify any comparators, let alone describe their similarities to his situation.  "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79 (citing FED. R. CIV. P. 8(a)(2)).  Either on its merits or on Defendants' qualified immunity defense, Gafford's equal-protection claim in Count I is properly dismissed.

## 2. *Monell* Claims Against Municipal Defendants (Count II)

Turning next to Gafford's § 1983 claims against the City of Grand Rapids and the City of Kentwood, Gafford alleges in Count II that "[t]he Cities of Grand Rapids and Kentwood … have maintained policies and practices, and/or customs that violated Plaintiff's protections under the U.S. Constitution, to be free from unreasonable arrest and detention and threat of bodily harm, and

Plaintiff's rights under the Fourteenth Amendment of the U.S. Constitution to due process of law and equal protection under the law" (Am. Compl. ¶ 150).

The City of Grand Rapids argues that it is entitled to dismissal of Gafford's *Monell* claim against it because Gafford does not identify any enactment or policy of the City of Grand Rapids in support of his claim and instead relies on vague and broad references to "public criticism" of the GRPD and "investigations" by the Michigan Department of Civil Rights into the Department (ECF No. 31 at PageID.344–345, citing Am. Compl. ¶¶ 152–158). The City of Grand Rapids emphasizes that criticism and investigations are not policies and are "not even legal determinations that the City has acted wrongfully" (*id.*).

The City of Kentwood points out that while Gafford spends several paragraphs discussing various investigations and alleged shortcomings of the GRPD, "[t]here is no mention or allegation of similar conduct by the City of Kentwood" (ECF No. 34 at PageID.483–484).

In response, Gafford argues that Defendants' motions to dismiss the *Monell* claim are "untimely at this stage of the proceedings" (ECF No. 42 at PageID.547–54; ECF No. 43 at PageID.647). Alternatively, Gafford argues that he has sufficiently pleaded his *Monell* claims based on the allegations in his Amended Complaint about the MDCR's charges against the GRPD for racial discrimination in police interactions with the community (ECF No. 42 at PageID.548) and the fact that the "City of Kentwood … is part of the metropolitan Grand Rapids area" (ECF No. 43 at PageID.648).

Gafford's *Monell* claims are properly dismissed.

A city is a "person" under § 1983 and so "can be held liable for constitutional injuries for which it is responsible." *Greene v. Crawford Cnty., Michigan*, 22 F.4th 593, 616 (6th Cir. 2022) (citing *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc.*

*Servs. of City of New York*, 436 U.S. 658, 690 (1978))).  However, a municipality cannot be held liable "under § 1983 on a respondeat superior theory—in other words, 'solely because it employs a tortfeasor.'"  *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691).  Rather, municipal liability under § 1983 depends on whether the plaintiff's constitutional rights have been violated as a result of "a 'policy' or 'custom' attributable" to the local government.  *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000).

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom."  *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).  A plaintiff can look to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations."  *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

The City of Kentwood properly points out that Gafford has provided no factual or legal support for his attempt to impute the alleged misdeeds of the GRPD to the KPD (Kentwood Defs. Reply, ECF No. 45 at PageID.792–793).  The *Monell* claim in Count II against the City of Kentwood is wholly lacking and is properly dismissed.

Gafford does not identify any specific policy of the GRPD and appears to be relying on a "custom-of-tolerance" theory of liability against the City of Grand Rapids.  "[A] custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).  However, Gafford cannot meet his pleading burden by simply referencing the MDCR's role in investigating civil rights violations. Investigations alone do not demonstrate a pattern of deliberate indifference.  *See generally Thomas*, 398 F.3d at 433–34 ("[Deliberate indifference 'does not mean a collection of sloppy, or

even reckless oversights; it means evidence showing an obvious, deliberate indifference' to the alleged violation.") (citation omitted).  Gafford's Amended Complaint simply supplies no factual basis from which this Court could reasonably infer that the City of Grand Rapids is liable for the alleged misconduct.  Consequently, Count II is also properly dismissed against the City of Grand Rapids.

### 3.  Dismissal with Prejudice

Defendants request that this Court dismiss Gafford's Amended Complaint with prejudice (Grand Rapids Defs., ECF No. 31 at PageID.351 & ECF No. 44 at PageID.714–715; Kentwood Defs., ECF No. 34 at PageID.486 & ECF No. 45 at PageID.795).  Gafford, who has already amended his Complaint once, has not requested leave for further amendment in response to Defendants' motions.  This Court agrees that dismissal with prejudice of Counts I and II is appropriate.  *See, e.g., Golf Vill. N., LLC v. City of Powell, Ohio*, 14 F.4th 611, 624 (6th Cir. 2021) (holding that a district court does not abuse its discretion in dismissing an amended complaint with prejudice where a plaintiff never moves for leave to file a second amended complaint); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 627–28 (6th Cir. 2019) (same).

### C.  Gafford's State-Law Claims

Having dismissed Counts I and II, the Court, in its discretion, declines to exercise supplemental jurisdiction over Gafford's remaining state-law claims in Counts III through VII and will dismiss these claims without prejudice.  *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—(3) the district court has dismissed all claims over which it has original jurisdiction"); *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims...").  *See, e.g., Brooks v.*

*Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("Upon dismissing Brooks' federal claims, the district court properly declined to exercise supplemental jurisdiction over Brooks' remaining state-law claims.").

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Motions to Dismiss (ECF Nos. 30 & 33) are GRANTED IN PART and DENIED IN PART; specifically, the motions are granted as to Counts I and II, which are DISMISSED WITH PREJUDICE, and the motions are otherwise denied.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the state-law claims in Counts III through VII, which are DISMISSED WITHOUT PREJUDICE.

Because this Opinion and Order resolves all pending claims, the Court will also enter a Judgment to close this case.  *See* FED. R. CIV. P. 58.

Dated:  April 4, 2024                                                    /s/ Jane M. Beckering
                                                                             JANE M. BECKERING
                                                                             United States District Judge